# 15-1407-cv

## United States Court of Appeals
### for the
## Second Circuit

ADAM BERKSON, individually and on behalf of all others similarly situated,
KERRY WELSH, individually and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

– v. –

GOGO LLC, GOGO INC.,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLANTS

Anthony J. Laura
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 642-1900

– and –

EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

David H. Hoffman
Tacy F. Flint
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

– and –

Jennifer J. Clark
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

*Attorneys for Defendants-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, defendants-appellants Gogo LLC and Gogo Inc. state that Gogo LLC is a wholly owned subsidiary of Gogo Intermediate Holdings LLC, which is in turn a wholly owned subsidiary of Gogo Inc., a publicly traded corporation.  No other publicly held corporation owns 10% or more of Gogo Inc.'s stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT .......................................................1

ISSUES PRESENTED FOR APPELLATE REVIEW..............................1

STATEMENT OF THE CASE...............................................................2

I.    FACTUAL BACKGROUND...........................................................4

    A.    Plaintiffs' Use Of Gogo's In-Flight Internet Service...........................4

    B.    Each Time They Signed Into Use Gogo's Service, Plaintiffs Were Given Notice Of And Assented To Gogo's Terms Of Use .................6

    C.    Relevant Provisions Of The Terms Of Use........................................11

II.   PROCEDURAL HISTORY ...........................................................13

STANDARD OF REVEW ...................................................................17

SUMMARY OF ARGUMENT .............................................................18

ARGUMENT .....................................................................................21

I.    PLAINTIFFS CONSENTED TO THE TERMS OF USE, AND AN ENFORCEABLE CONTRACT WAS FORMED .......................................21

    A.    The District Court Improperly Departed From Standard Contract Interpretation Principles ..............................................................21

    B.    Plaintiffs Had Reasonable Notice That They Were Agreeing To The Terms Of Use ...............................................................................25

        1.    In order to use the site, consumers have to sign in and expressly assent to the Terms of Use........................................25

        2.    The overwhelming weight of authority demonstrates that such agreements are effective ....................................................27

3. The district court erroneously concluded that Plaintiffs did not assent..................................................................34

II. THE ARBITRATION CLAUSE SHOULD BE ENFORCED .....................42

III. THE FORUM-SELECTION CLAUSE SHOULD BE ENFORCED...........50

A. This Court Has The Power To Review The Validity Of The Forum-Selection Clause ......................................................51

B. The Forum-Selection Clause Is Enforceable.......................................53

1. The forum-selection clause is presumptively enforceable........55

2. Plaintiffs cannot satisfy their burden to overcome the presumption...............................................................57

C. The Forum-Selection Clause Requires Transfer Of The Case To The Northern District Of Illinois.........................................58

CONCLUSION ......................................................................60

# <u>TABLE OF AUTHORITIES</u>

**Page**

## Cases

*5381 Partners LLC v. Shareasale.com, Inc.*,
   No. 12-CV-4263 JFB AKT, 2013 WL 5328324 (E.D.N.Y. Sept.
   23, 2013) ..................................................................................................31

*Air Safety, Inc. v. Teachers Realty Corp.*,
   706 N.E.2d 882 ........................................................................................54

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740, 179 L. Ed. 2d 742 (2011)............................................43

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986)..................................................................................45

*Atl. Marine Constr. Co v. U.S. Dist. Ct. for the W. Dist. of Tex.*,
   134 S. Ct. 568 (2013).....................................................50, 53, 58, 59

*AVC Nederland B.V. v. Atrium Inv. P'ship*,
   740 F.2d 148 (2d Cir. 1984) ...................................................................58

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec.
   Act (ERISA) Litig.*,
   772 F.3d 125 (2d Cir. 2014) ...................................................................17

*Bensadoun v. Jobe-Riat*,
   316 F.3d 171 (2d Cir. 2003) ...................................................................23

*Berkson v. Gogo LLC*,
   No. 14-CV-1199, --- F. Supp. 3d ---, 2015 WL 1600755 (E.D.N.Y.
   Apr. 9, 2015)..............................................................................................2

*The Bremen v. Zapata Off-Shore Co.*,
   407 U.S. 1 (1972).....................................................................................57

*Bulova Watch Co. v. K. Hattori & Co.*,
   508 F. Supp. 1322 (E.D.N.Y. 1981) ......................................................35

*Carnival Cruise Lines, Inc. v. Shute*,
499 U.S. 585 (1991)...............................................................56, 58

*Carson v. Higbee Co.*,
149 F. App'x 289 (5th Cir. 2005) ........................................49

*Cnty. of Du Page v. RWS Dev., Inc.*,
643 N.E.2d 242 (Ill. App. Ct. 1994) ...................................55

*Coenen v. R. W. Pressprich & Co.*,
453 F.2d 1209 (2d Cir. 1972) ........................................44, 47

*Concourse Vill., Inc. v. Local 32E, Serv. Emps. Int'l Union, AFL–CIO*,
822 F.2d 302 (2d Cir.1987) ................................................44

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*,
993 F.2d 269 (1st Cir. 1993).............................................36

*Crawford v. Beachbody, LLC*,
No. 14-cv-1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014) ........................................................................31

*In re Currency Conversion Fee Antitrust Litig.*,
265 F. Supp. 2d 385 (S.D.N.Y. 2003) ...............................47

*D.H. Blair & Co. v. Gottdiener*,
462 F.3d 95 (2d Cir. 2006) ...............................................57

*E.K.D. ex rel. Dawes v. Facebook, Inc.*,
885 F. Supp. 2d 894 (S.D. Ill. 2012)...................................31

*Ellington v. EMI Music, Inc.*,
21 N.E.3d 1000 (N.Y. 2014)...............................................54

*Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*,
715 N.E.2d 1050 (N.Y. 1999)..............................................21

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*,
865 F.2d 513 (2d Cir. 1989) ..............................................52

*Freeman v. Complex Computing Co.*,
119 F.3d 1044 (2d Cir. 1997) ............................................52

*Fteja v. Facebook, Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012) ..........................................................30, 38

*Griswold v. Coventry First LLC*,
    762 F.3d 264 (3d Cir. 2014) ...............................................................................52

*Guadagno v. E\*Trade Bank*,
    592 F. Supp. 2d 1263 (C.D.Cal.2008) .................................................................32

*Koenke v. Koenke*,
    91 A.D.2d 1142 (N.Y. App. Div. 1983) ...............................................................56

*Kristian v. Comcast Corp.*,
    446 F.3d 25 (1st Cir. 2006) .................................................................................46

*Levin v. Alms & Assocs., Inc.*,
    634 F.3d 260 (4th Cir. 2011) ...............................................................................46

*Luna v. Pico*,
    356 F.3d 481 (2d Cir. 2004) ...............................................................................52

*Martin v. Heinold Commodities, Inc.*,
    510 N.E.2d 840 (Ill. 1987) ..................................................................................54

*Martinez v. Bloomberg LP*,
    740 F.3d 211 (2d Cir. 2014) .........................................................................54, 57

*Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*,
    229 F.3d 397 (2d Cir. 2000) ...............................................................................17

*Mehler v. Terminix Int'l Co.*,
    205 F.3d 44 (2d Cir. 2000) .................................................................................46

*Miller v. Wolpoff & Abramson, L.L.P.*,
    321 F.3d 292 (2d Cir. 2003) ...............................................................................18

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983).................................................................................................23

*N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010) ...............................................................................17

*Nicosia v. Amazon.com, Inc.*,
  ---F. Supp. 3d ---, 2015 WL 500180 (E.D.N.Y. Feb. 4, 2015),
  *appeal docketed*, No. 15-423 (2d Cir. Feb. 13, 2015) ........................................30

*Pleasant Grove Union Sch. Dist. v. Algeo*,
  215 P. 726 (Cal. Dist. Ct. App. 1923)................................................................56

*Preston v. Ferrer*,
  552 U.S. 346 (2008)..........................................................................................43

*Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*,
  991 F.2d 42 (2d Cir. 1993) ................................................................................43

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ..............................................................................21

*Reigelsperger v. Siller*,
  150 P.3d 764 (Cal. 2007) ...................................................................................21

*Robinson Knife Mfg. Co. v. Comm'r*,
  600 F.3d 121 (2d Cir. 2010) ..............................................................................18

*Rosin v. First Bank of Oak Park*,
  466 N.E.2d 1245 (Ill. App. Ct. 1984) ................................................................21

*Ross v. Am. Express Co.*,
  547 F.3d 137 (2d Cir. 2008) .........................................................................51, 52

*Sacchi v. Verizon Online LLC*,
  No. 14-CV-423-RA, 2015 WL 765940 (S.D.N.Y. Feb. 23, 2015),
  *reconsideration denied*, No. 14-CV-423 RA, 2015 WL 1729796
  (S.D.N.Y. Apr. 14, 2015)...................................................................................47

*Scherk v. Alberto-Culver Co.*,
  417 U.S. 506 (1974)..........................................................................................52

*Schnabel v. Trilegiant Corp.*,
  697 F.3d 110 (2d Cir. 2012) ..................................................................22, 28, 36

*Shaw v. Delta Air Lines, Inc.*,
  463 U.S. 85 (1983)............................................................................................57

*Simpson v. City of N.Y.*,
--- F.3d ---, 2015 WL 4256471 (2d Cir. July 15, 2015) ....................................42

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*,
198 F.3d 88 (2d Cir. 1999) ........................................................45, 46

*Snap-on Bus. Solutions Inc. v. O'Neil & Assocs.*,
708 F. Supp. 2d 669 (N.D. Ohio 2010) ............................................32

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ....................................................21, 22, 38

*Starke v. Gilt Groupe, Inc.*,
No. 13-Civ-5497(LLS), 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ....................................................................................31

*Stolt-Nielsen SA v. Celanese AG*,
430 F.3d 567 (2d Cir. 2005) ..............................................................51

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ..............................................32

*Tompkins v. 23andMe, Inc.*,
Nos. 5:13-CV-05682-LHK et al., 2014 WL 2903752 (N.D. Cal. June 25, 2014) ....................................................................31

*TradeComet.com LLC v. Google, Inc.*,
435 F. App'x 31 (2d Cir. 2011) ........................................................47

*United States v. Figueroa*,
548 F.3d 222 (2d Cir. 2008) ..............................................................53

*In re Verisign, Inc. Derivative Litig.*,
531 F. Supp. 2d 1173 (N.D. Cal. 2007)..............................................46

*Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*,
661 F.3d 164 (2d Cir. 2011) ..............................................................23

*Waller v. Truck Ins. Exch., Inc.*,
900 P.2d 619 (Cal. 1995) ..................................................................54

viii

*Whitt v. Prosper Funding LLC*,
　　No. 1:15-CV-136-GHW, 2015 WL 4254062, (S.D.N.Y. July 14,
　　2015) ..................................................................................................30, 38

*Zaltz v. JDATE*,
　　952 F. Supp. 2d 439 (E.D.N.Y. 2013) ..........................................31, 38

*Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*,
　　13 F.3d 330 (10th Cir. 1993) .............................................................46

**Statute**

28 U.S.C. § 1404(a) .......................................................................51, 58

**Scholarly Authorities**

Allison S. Brehm & Cathy D. Lee, *"Click Here to Accept the Terms of
　　Service"*, Comm. Law. (Winter 2015)..................................................34

Christina L. Kunz et al., *Browse-Wrap Agreements: Validity of
　　Implied Assent in Electronic Form Agreements*, 59 Bus. Law. 279
　　(2003) ...............................................................................................33

**Other Authorities**

ABA, *National Lawyer Population Survey* (2015),
　　http://www.americanbar.org/content/dam/aba/administrative/
　　market_research/total-national-lawyer-population-1878-
　　2015.authcheckdam.pdf ....................................................................48

*Oxford English Dictionary* (2015),
　　http://www.oed.com/view/Entry/8973?redirectedFrom=any#eid.....................56

U.S. Courts, *Federal Judicial Caseload Statistics 2014 Tables*,
　　*available at* http://www.uscourts.gov/ statistics-reports/federal-
　　judicial-caseload-statistics-2014-tables (updated Mar. 31, 2014)......................59

1 *Weinstein's Federal Evidence* (2015)..................................................35

8 *Williston on Contracts* (4th ed. 2015).........................................47, 48

## JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of New York has subject matter jurisdiction over this action under 28 U.S.C. § 1332. This Court has appellate jurisdiction under 9 U.S.C. § 16, as Defendants-Appellants Gogo LLC ("Gogo") and Gogo Inc. (together, "Defendants") have appealed the district court's denial of their motion to compel the plaintiffs, Adam Berkson ("Berkson") and Kerry Welsh ("Welsh") (collectively, "Plaintiffs"), to individually arbitrate their claims against Defendants.

## ISSUES PRESENTED FOR APPELLATE REVIEW

1. Did the district court err in refusing to compel arbitration on the ground that, according to the district court's *sua sponte* social science research, Plaintiffs did not manifest assent to the arbitration agreement contained in Gogo's Terms of Use where: (a) Plaintiffs were expressly and conspicuously notified through text adjacent to the "Sign In" button that, by clicking the "Sign In" button, they would "agree to the terms of use"; (b) the full content of the Terms of Use, including the arbitration provision, was easily and immediately accessible to Plaintiffs through a hyperlink in that text; (c) Plaintiffs indisputably clicked the "Sign In" button; and (d) a host of authorities, from this Court and many others, have held that conduct just like Plaintiffs' here manifests assent to contractual terms?

2.    Did the district court err in refusing to enforce the forum-selection clause in Gogo's Terms of Use based on the same erroneous conclusion that Plaintiffs had not assented to the Terms of Use?

## STATEMENT OF THE CASE

Gogo's appeal arises from the denial by the district court (Weinstein, J.) of Gogo's motion to compel arbitration or in the alternative to transfer the action to the Northern District of Illinois.  *Berkson v. Gogo LLC*, No. 14-CV-1199, --- F. Supp. 3d ---, 2015 WL 1600755 (E.D.N.Y. Apr. 9, 2015).

Gogo is a provider of in-flight internet services to passengers on commercial airlines.  Like virtually all internet-based merchants of goods or services, Gogo intends and requires that a customer's use of Gogo's in-flight internet service is to be governed by certain Terms of Use.  In order to accomplish that objective, Gogo requires that its customers sign in each and every time they use Gogo's service.  As part of that process, they are first required to affirmatively express their agreement to Gogo's Terms of Use, failing which they cannot access Gogo's service.

The customers' affirmative agreement to Gogo's Terms of Use has occurred in two ways, depending on the date of use.  Through August of 2011, during the process of signing in to use Gogo's service, a customer was required to affirmatively click-check a box on Gogo's sign-in portal next to which appeared the legend "I agree to the Terms of Use."  At that very location, the Terms of Use

2

were hyperlinked, which was indicated by having the words "Terms of Use" underlined and highlighted in blue, so that the customer could immediately access them by clicking on the words "Terms of Use." Later in 2011, and through the time of the filing of this action, the check box on Gogo's sign-in portal was replaced by a "Sign In" or "Next" button, immediately adjacent to which was the legend "By clicking Sign In [Next] I agree to the terms of use and privacy policy." Once again, at that very location, the Terms of Use were hyperlinked for immediate customer access and review.

Within those Terms of Use are explicit provisions in which Gogo and its customers agree to individually arbitrate any claims a customer may allege against Gogo that relate in any way to or arise out of, *inter alia*, the Gogo service. The Terms of Use also contain an explicit forum-selection provision stating that any disputes not resolved in arbitration shall be resolved exclusively in a state or federal court of competent jurisdiction in Chicago, Illinois, where Gogo is headquartered.

Courts within this Circuit have uniformly held (other than the district court in this case) that by virtue of sign-in processes materially identical to the process employed by Gogo here, the merchant and the customer have contractually bound themselves to the merchant's respective terms of use. Decisions of other courts throughout the country are in accord. Although the district court acknowledged the

3

weight of the law, it reached a different conclusion only by gathering and fundamentally misreading empirical studies and anecdotal evidence never addressed by the litigants—ultimately holding that Plaintiffs could not be held to have assented to Gogo's Terms of Use based on the court's understanding of the behavioral characteristics of the "unsophisticated," "average internet user." The district court also created a novel, four-part test for determining whether such "unsophisticated" users have bound themselves to Terms of Use contracts like Gogo's. Using its test, the district court also refused to transfer venue according to the Terms of Use's forum-selection clause. The specific facts of this case, the overwhelming legal consensus among courts in this Circuit and elsewhere, and the practicalities of internet commerce require that this Court reverse the district court's refusal to compel arbitration or transfer venue.

## I.    FACTUAL BACKGROUND

### A.    Plaintiffs' Use Of Gogo's In-Flight Internet Service.

Gogo is an Illinois corporation that provides in-flight internet services on a number of commercial airlines. During flights on those airlines, passengers are able to gain access to a web-portal, where they are offered the ability to purchase in-flight access to the internet through Gogo's service in the form of a "pass." A17 ¶ 16; A109; A124–26. Among the various passes Gogo has offered are "monthly"

4

passes, which are recurring monthly subscriptions to Gogo's service for which customers are billed monthly until they cancel. *See, e.g.*, A50.

Both Plaintiffs here purchased such a monthly subscription from Gogo by signing up for Gogo's services through its web-portal during a flight. Plaintiff Welsh purchased in-flight internet service from Gogo on a flight from Los Angeles, California to Seattle, Washington in August 2011 for the monthly price of $39.95. A17 ¶ 15; A39 ¶ 6; A174. Plaintiff Berkson purchased in-flight internet service on a flight from New York, New York to Indianapolis, Indiana in September 2012 for the monthly price of $34.95. A16 ¶ 7; A38 ¶ 3. Both passes renewed automatically each month, with the recurring charges made to the credit card that each Plaintiff put on file for their Gogo account. A19 ¶ 22; A38–39 ¶¶ 3, 6, 8.

Welsh and Berkson both used Gogo's service multiple times in the several months after their initial use. Welsh used Gogo's service by signing in through the Gogo web-portal on at least 38 separate flights, from August 2011 through February 2014. A45 ¶ 9. Berkson used Gogo's service by signing in through the Gogo web-portal on at least 12 separate flights, from September 2012 through January 2014. A45 ¶ 7.

Both Plaintiffs ultimately canceled their monthly service subscriptions, and both were reimbursed for all monthly charges paid following the month in which

5

each initially signed up for service. Welsh canceled his monthly service subscription in February 2013, and Gogo agreed to reimburse Welsh by refunding to him all of the recurring monthly charges Gogo had billed to him under his August 2011 subscription, including for months in which he actually made use of Gogo's service. A39–40 ¶ 9. Berkson also sought a refund from his credit card company, American Express, of the recurring monthly charges Gogo had billed to him in October, November, and December 2012—and the charges were removed as Berkson requested. A39 ¶¶ 4–5. Thus, while Plaintiffs were initially billed on a recurring monthly basis for Gogo service, both later obtained full reimbursement for those recurring monthly charges.

## B. Each Time They Signed In To Use Gogo's Service, Plaintiffs Were Given Notice Of And Assented To Gogo's Terms Of Use.

At all times relevant to this case, the only way that a customer could use Gogo's internet service—whether the customer was signing up for the first time or returning to Gogo to make use of an existing subscription—was by signing in to Gogo's web portal. A45–46 ¶¶ 8, 10; A122–23 ¶¶ 3–4; A124–26 (screenshots of the sign-in process). Accessing the internet by use of Gogo's service required affirmatively completing Gogo's sign-in process. A122–23 ¶¶ 3–4; A157. Although the sign-in process underwent minor modifications during the relevant time period, as detailed below, every time either of Plaintiffs used Gogo's service,

6

he was required to and did complete the sign-in requirements—including affirmatively assenting to Gogo's Terms of Use. *Id.*; *see also* A45–46 ¶¶ 8, 10.

In August 2011, when Welsh purchased his monthly subscription, Gogo's sign-in portal employed a "check box" method. A122–23 ¶¶ 3–4; A124. In order to gain access to Gogo's internet service, the customer was required to click-check a box, next to which appeared the legend "I agree to the <u>Terms of Use</u>." A122 ¶ 3; A124; A157. The words "<u>Terms of Use</u>" in the legend provided a highlighted, blue hyperlink to a page on which the full text of the Terms of Use were displayed. A122 ¶ 3. Only after click-checking the box next to the legend indicating agreement to the Terms of Use could a user proceed to access internet service. A157. The sign-in page as it appeared in August 2011 looked as follows:

A124.

Later in 2011, Gogo revised its sign-in portal. Instead of the check-box, it employed a "Sign In" or "Next" button, adjacent to which appeared the legend "By clicking 'Sign In' ['Next'] I agree to the terms of use and privacy policy." A123 ¶ 4; A125–26. Again, the words "terms of use" in the legend provided an

8

underlined hyperlink to a page on which the full text of the Terms of Use were

displayed.  A123 ¶ 4.  And again, a customer could not access Gogo's internet

service without clicking on the "Sign In" or "Next" button next to the legend

indicating agreement to the Terms of Use.  A123 ¶ 4; A158.  This "Sign In" /

"Next" button design was in place for the remaining time relevant to this case,

including all of 2013.  A123 ¶ 5.  The sign-in page using the "Sign In" and "Next"

buttons looked as follows:



A125–26.

As the above images make clear, in each instance that Welsh and Berkson encountered Gogo's sign-in portal, the existence of the Terms of Use was readily apparent. Directly adjacent to the check-box employed during Welsh's initial subscription, and directly adjacent to the Sign-In button employed during subsequent sign-ins, was the statement "I agree to the terms of use …." No customer could proceed past that page without clicking the check-box or the Sign-In button. Moreover, directly adjacent to the check-box or Sign-In button, the

10

Terms of Use were hyperlinked, as commonly represented by underlining of the words "Terms of Use."  Any user could thus have immediately accessed the full text of the Terms of Use by clicking the hyperlink.  In short, Welsh and Berkson—like all Gogo users—were fully informed of the existence of the Terms of Use and had full access to the content of those terms; and were likewise fully informed that they would indicate agreement to the Terms of Use by clicking the box or Sign-In button.

Although Plaintiffs have challenged their assent to the Terms of Use in this litigation, both conspicuously ***do not*** say that they did not complete the sign-in process as described above.  *See* A110–17.  **Neither plaintiff** says that he did not see the references to the Terms of Use at the sign-up screens.  **Neither plaintiff** says that he did not click the "I agree" check-box or the "Sign In/Next" button on the sign up screens.  **Neither plaintiff** suggests that he was unaware of or unable to access the Terms of Use at the time of his initial sign up for Gogo service or during subsequent sign-ins.  To the contrary, the evidence that *all* Gogo users—*including Plaintiffs*—were required to indicate agreement to the Terms of Use in the manner shown here is undisputed.

## C.    Relevant Provisions Of The Terms Of Use

The Terms of Use to which Plaintiffs agreed contain two provisions material to this appeal.  As of December 13, 2012, and at all times thereafter, the Terms of

11

Use contained a provision entitled "Dispute Resolution/Arbitration." A70–71; *see also* A80–82. As relevant here, the arbitration provision stated that "the sole and exclusive forum for ***any and all disputes and claims*** … that relate in any way to or arise out of the Site, the Service or these Terms and Conditions, shall be final and binding arbitration …." A70 (emphasis added). The arbitration provision also included a class action waiver—written in capital lettering—which prohibited the aggregation of one user's claims with another's and expressly provided that "NO CLASS ARBITRATION PROCEEDINGS SHALL BE PERMITTED." A71 (capitalization in original). The arbitration provision, and specifically the class action waiver, were carefully brought to users' attention: On the first page of the Terms of Use, the customer was advised, in bold capital lettering, of the inclusion of an "**AGREEMENT TO MANDATORY ARBITRATION**" and a "**CLASS ACTION WAIVER**" in the Terms of Use. A64 (emphasis and capitalization in original).

As noted above, the arbitration provision was incorporated into Gogo's Terms of Use in December 2012—after both Plaintiffs had initially subscribed to Gogo's service. However, both Plaintiffs signed into Gogo's service multiple times *after* December 2012, *supra* p. 5, and thus assented to the revised Terms of Use that included the arbitration provision. Moreover, the arbitration provision broadly provided for arbitration of "any and all disputes and claims" arising from

12

Gogo's service, A70, placing no temporal limits on which claims related to Gogo's service would be subject to arbitration.

In addition to the arbitration provision, the Terms of Use at all relevant times included a forum-selection provision. Entitled "Governing Law and Venue," the forum-selection clause stated—with modest, non-material variation as the Terms of Use were revised—that any unresolved claim or dispute between the parties "must be resolved exclusively by a court of competent jurisdiction, federal or state, located in Chicago, Illinois, and no other court." A54; A62; A72; A82. The forum-selection clause was included in the Terms of Use from August 2011 (when Welsh first signed up for Gogo's service) and at all times thereafter—*i.e.*, every time either Plaintiff signed into Gogo's service, thereby agreeing to the Terms of Use. *Id.*

## II. PROCEDURAL HISTORY

Berkson initiated this lawsuit in February 2014, filing a Class Action Complaint alleging for himself and a putative class of Gogo customers that Gogo did not sufficiently make them aware that they were subscribing to a recurring monthly service which would continue, and for which they would be billed monthly, until they canceled. A2. Plaintiffs filed the Amended Class Action Complaint on April 24, 2014, adding Welsh as a named plaintiff and putative class representative. A14–35. The Amended Complaint alleges the violation of various

13

state consumer protection statutes, common law unjust enrichment, and breach of the implied covenant of good faith and fair dealing.

On May 12, 2014, Defendants moved to compel arbitration under the Federal Arbitration Act or, in the alternative, to transfer the case to the Northern District of Illinois or to dismiss the case for lack of standing (since Gogo had previously reimbursed Plaintiffs for all of their charges). A36–37. Defendants' requests to compel arbitration and to transfer venue were premised on the provisions of Gogo's Terms of Use, a valid, binding contract to which Plaintiffs had assented each time they signed into Gogo's service. Plaintiffs opposed the relief sought, contending *inter alia* that they had not assented to the arbitration provision or the forum-selection clause.

The district court denied Gogo's motion in its entirety. The court's analysis ranged well beyond the question whether Plaintiffs had received notice of and agreed to Gogo's Terms of Use, spending many pages analyzing generally the formation of and assent to what the court termed "electronic contracts of adhesion" in a variety of internet contexts. It began with an analysis of the attributes of "the average North American internet user's understanding of websites' 'terms of use.'" A185–95. Though it lamented a lack of "[r]eliable scientifically-based studies assessing the types of visual and written cues that put a representative sample of American society, *i.e.*, the average internet user, on actual notice of the importance

14

and ramifications of 'terms of use,'" A189–90, the court concluded that "[i]n the absence of contrary proof, it can be assumed that the burden should be on the offeror to impress upon the offeree—*i.e.*, the average internet user—the importance of the details of the binding contract being entered into," A193. The court next summarized the law of contract formation and validity generally, and the application of that law to four categories of "electronic adhesion contracts"— "browsewrap," "clickwrap," "scrollwrap," and "sign-in-wrap" (the form of contract that the district court believed to be at issue here). While the district court acknowledged that multiple courts had held what it termed "sign-in-wrap" agreements like the one between Gogo and its customers to provide adequate notice and ensure valid assent by consumers, the court suggested that such holdings "presuppose[] intensive and extensive use of the internet, an assumption not easily justifiable when the user is buying only one or a few items through this system." A224. Additionally, the court emphasized that "[a] 'hyperlink' … with its serious legal ramifications, may not be fully understood by many consumers." *Id*.

Finally, after distilling the social science and case law it had discussed into a series of "general principles," the district court set forth a novel four-part test for "analyzing sign-in-wraps, and electronic contracts of adhesion generally":

15

(1)   Aside from clicking the equivalent of sign-in …, is there substantial evidence from the website that the user was aware that she was binding herself to more than an offer of services or goods in exchange for money? …

(2)   Did the design and content of the website, including the homepage, make the 'terms of use' … readily and obviously available to the user? …

(3)   Was the importance of the details of the contract obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product? …

(4)   Did the merchant clearly draw the consumer's attention to material terms …? …

A227–28.  If the answer to any of the court's four questions was no, the terms of use could not be enforced.  *Id.*  Moreover, the court emphasized that the burden remains firmly on the internet vendor:  "[U]ntil useful consumer studies demonstrate that average consumers using the computer understand what contract terms are being accepted when a purchase is made, preemptive rules in favor of vendors who do not forcefully draw purchasers' attention to terms disadvantageous to them should be rejected. … Proof of special know-how based on the background

16

of the potential buyer or adequate warning of adverse terms by the design of the agreement page or pages should be required before adverse terms, such as compelled arbitration or forced venue, are enforced." A228.

The court accordingly declined to enforce Gogo's Terms of Use. A228–31. Having concluded that Plaintiffs did not assent to Gogo's Terms of Use, the district court held that the entire Terms of Use were unenforceable, and on that basis declined to enforce either the arbitration provision or the forum selection clause.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion to compel arbitration. *See, e.g., Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.*, 229 F.3d 397, 402 (2d Cir. 2000). The standard of review of the denial of a motion to transfer venue is for abuse of discretion. *See N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc*., 599 F.3d 102, 112 (2d Cir. 2010). A district court abuses its discretion when it makes an error of law, or when its decision "cannot be located within the range of permissible decisions." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 132 (2d Cir. 2014) (per curiam) (internal quotation marks omitted). Because the district court here declined to transfer the case based on its determination as a matter of law, under a novel and erroneous legal standard, that the Terms of Use (including the forum-selection provision) were unenforceable, that determination is reviewed

*de novo* as well.  *Robinson Knife Mfg. Co. v. Comm'r*, 600 F.3d 121, 124 (2d Cir.

2010) (questions of law are reviewed *de novo*); *Miller v. Wolpoff & Abramson,*

*L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003).

## SUMMARY OF ARGUMENT

Under basic contract law principles, Plaintiffs agreed to arbitrate any and all

claims related in any way to Gogo's in-flight internet service.  Each of the

numerous times Plaintiffs signed in during a flight to use the service, they assented

to the Terms of Use, including the arbitration and forum-selection clauses, by

clicking the "Sign In" button directly below the statement "By clicking 'Sign In' I

agree to the <u>terms of use</u>."  Plaintiffs could readily access the full text of the

agreement simply by clicking on the prominently-displayed hyperlinked phrase

"<u>terms of use</u>."  As numerous other courts have held, a reasonably prudent offeree

in such circumstances would have known of the existence of contract terms to

which he or she was agreeing, and the contract is therefore enforceable.

In ruling to the contrary, the district court invented a novel multi-part

standard that runs counter to rulings by this Court and multiple district courts, that

is weighted heavily and improperly against arbitration, and that places an improper

burden on internet vendors.  The district court also seriously misread the record,

ignoring clear and uncontroverted evidence that Plaintiffs took the affirmative

actions required to manifest assent to the contract, and it failed to follow this

18

Court's admonition that in determining arbitrability, all inferences should be drawn in favor of defendants. It further improperly relied on extra-record, ambiguous social science and anecdotal evidence, which have nothing to do with the facts of this case, without giving the parties notice and a chance to respond. It then compounded that error by holding these studies and the *lack* of clear social science evidence against Gogo.

Because Plaintiffs assented to the Terms of Use, the district court should have enforced the arbitration clause. Under the plain language of the clause, Plaintiffs were required to arbitrate the claims at issue in this action. This conclusion is inescapable in light of the strong national policy favoring arbitration that requires resolving any doubts about arbitrability in favor of arbitration. Plaintiffs agreed to arbitrate, their claims fall under the broadly-worded arbitration clause, and there is no other reason not to enforce the arbitration provision. This Court should remand with instructions to dismiss the case and direct the parties to arbitrate.

Plaintiffs also assented to the forum-selection clause in the Terms of Use, which requires any claims that are not subject to arbitration to proceed in Illinois. This Court can and should review the district court's refusal to enforce the forum-selection clause since it is inextricably intertwined with the issue of the enforceability of the arbitration clause. Should the Court decide against enforcing

the arbitration clause, it should nonetheless enforce the forum-selection clause. That provision is presumptively enforceable, and Plaintiffs cannot make the required strong showing of injustice or unreasonableness to overcome that presumption. Because the forum-selection clause is valid, this Court should transfer the action unless Plaintiffs can show that transfer is unwarranted based solely on public interest factors. They cannot. This Court should therefore enforce the parties' agreement and remand with instructions to transfer this case to the Northern District of Illinois.

## ARGUMENT

## I. PLAINTIFFS CONSENTED TO THE TERMS OF USE, AND AN ENFORCEABLE CONTRACT WAS FORMED.

### A. The District Court Improperly Departed From Standard Contract Interpretation Principles.

This case presents a straightforward question of contract law: did Plaintiffs agree to the Terms of Use and form an enforceable contract that requires them to arbitrate their claims? Nothing about the internet context of this agreement changes the basic contract principles that apply. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 28 (2d Cir. 2002); *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 403 (2d Cir. 2004) ("While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.").

To determine whether a contract was formed, courts look for mutual manifestation of assent. *Specht*, 306 F.3d at 28 ("[A] transaction, in order to be a contract, requires a manifestation of agreement between the parties.").[1] Assent to contract terms is found when a *reasonably prudent offeree* in the circumstances would have known of the existence of contract terms to which he or she was

---

[1] In *Specht*, the court applied California contract law. Here, the district court held that California, New York, or Illinois law would apply. The standard for assent is the same in all three states. *See, e,g.*, *Reigelsperger v. Siller*, 150 P.3d 764, 767 (Cal. 2007); *Express Indus. & Terminal Corp. v. N.Y. Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999); *Rosin v. First Bank of Oak Park*, 466 N.E.2d 1245, 1249 (Ill. App. Ct. 1984).

agreeing. *Id.* at 30–31. As this Court explained in *Specht*, in the context of paper contracts, "receipt of a physical document containing contract terms or notice thereof is frequently deemed … a sufficient circumstance to place the offeree on inquiry notice of those terms." *Id.* at 31. The principle behind such cases—that a person "'who has actual notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, has constructive notice of the fact itself in all cases in which, by prosecuting such inquiry, he might have learned such fact'"— applies "equally to the emergent world of online product delivery, pop-up screens, hyperlinked pages, clickwrap licensing, scrollable documents, and urgent admonitions to 'Download Now!'" *Id.* As a result, an internet user manifests assent to contract terms by clicking on "I accept" or on "Sign In" (where "Sign In" indicates assent) if a reasonably prudent offeree in the circumstances would have known of the existence of the terms accepted.[2] *Id.*

In determining whether there was mutual manifestation of assent to arbitration, the court must draw all factual inferences in Gogo's favor. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012) ("As it relates to the question of whether an arbitration agreement was formed, we interpret the

---

[2] Gogo's references to the "reasonably prudent offeree" and "constructive notice" are not intended to foreclose its argument that, on the facts here, Plaintiffs had *actual notice* of the provisions of the Terms of Use, and specifically the arbitration and forum selection clauses within the Terms of Use. Plaintiffs never disavow having read the Terms of Use or having seen those specific clauses at the times those clauses appeared in the Terms of Use.

record as a whole in the light most favorable to the defendants, the party against whom the district court resolved the motion to compel arbitration.")  As the Supreme Court has explained, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).  *See also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) (inferences must be drawn in favor of arbitration).

Only if there is no material factual dispute can the court decide against arbitration.  To the extent there were any factual disputes relevant to arbitration, the district court was required to hold a trial.  *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).

Despite paying lip service to at least some of these straightforward principles,[3] the district court failed to apply them.  Instead, the court invented a novel and incorrect standard.  Stating that it wanted to ensure that vendors

---

[3] A203 ("'Mutual manifestation of assent' is the 'touchstone' of a binding contract.") (quoting *Specht*, 306 F.3d at 29); A212 (where assent is "'largely passive,' …'the contract-formation question will often turn on whether a reasonably prudent offeree would be on [inquiry] notice of the term[s] at issue.'") (quoting *Schnabel*, 697 F.3d at 120, 126–27).

"forcefully draw purchasers' attention to terms disadvantageous to them," the court devised a new "four-part" inquiry that bars enforcement of terms of use, including arbitration clauses, unless (1) there is "substantial evidence from the website" "[a]side from clicking the equivalent of a sign-in" that "the user was aware that she was binding herself to more than" a purchase of goods or services; (2) "the design and content of the website, including the homepage, make the 'terms of use' … readily and obviously available to the user"; (3) "the importance of the details of the contract" are not "obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product"; and (4) "the merchant clearly draw[s] the consumer's attention to material terms that would alter" the "default rights" to not make automatic payments, to bring a state-law consumer protection suit in state court, and to participate in a class action.  A226–28.  On top of these four stringent requirements, the district court added two more: it placed "the burden of showing agreement to details" of a website contract on the vendors, and it required "[p]roof of special know-how based on the background of the potential buyer or adequate warning of adverse terms by the design of the agreement page or pages."  *Id*.

There is no case law support for the district court's extraordinary standard that creates multiple layers of heightened requirements to defeat arbitrability. Indeed, it runs counter to numerous cases finding terms of use enforceable despite

24

the lack of one or more of the district court's multiple required showings, proof of the consumer's "special know-how," or warnings about adverse terms. *Infra* 30–33. Moreover, the district court's standard places an improper burden on the internet vendor and disregards the strong federal policy in favor of arbitration. Under the correct standard, as it has been applied by this Court and numerous others, the parties clearly entered into a valid and enforceable arbitration agreement.

## B. Plaintiffs Had Reasonable Notice That They Were Agreeing To The Terms Of Use.

Plaintiffs each signed in to use Gogo's in-flight internet services, and by doing so, they manifested their assent to the Terms of Use, which contained an arbitration clause and a forum-selection clause. As multiple cases in this Circuit and elsewhere demonstrate, Plaintiffs had reasonable notice of the terms and conditions in the contract and their assent is therefore effective. As a result, the Terms of Use are binding upon the parties. In ruling to the contrary, the district court violated basic contract principles and frustrated the parties' intent in making their contract.

### 1. In order to use the site, consumers have to sign in and expressly assent to the Terms of Use.

It is undisputed that both Plaintiffs used the site multiple times after December 2012. *See* A45. To do so, they had to sign in each time via the sign-in

page.  That page displayed entry fields for the user's email/username and

password.  A125.  Directly below these fields was the sentence "By clicking 'Sign

In' I agree to the <u>terms of use</u> …."  *Id.*  The phrase "terms of use" was hyperlinked

to the full contractual provisions as indicated through the standard convention of

underlining.  Directly below this sentence was the "Sign In" button.  *Id.*

Users would see all three features— (i) username and password entry fields,

(ii) notice that clicking "Sign In" equals agreement to the hyperlinked terms of use,

and (iii) "Sign In" button—together on a single screen without having to scroll

down or otherwise further navigate around the website.  Although the sign-in page

also displayed another button labeled "Sign In" in the upper right-hand corner,

uncontroverted evidence established that this was merely a navigation button that

when clicked would take the user back to the sign-in page.  A158.  To actually use

the site, as Plaintiffs did, the user had to click the "Sign In" button directly below

the notice of agreement to the terms of use.  *Id.*[4]

---

[4] When plaintiffs initially signed up, they encountered a "create account" page that
similarly put them on inquiry notice of the Terms of Use.  Welsh encountered a
"create account" page with empty fields where the user had to enter information
such as first and last name, username and password, beneath which a check box
next to the statement "I agree to the **Terms of Use**."  A178.  Uncontroverted
evidence established that to proceed to use the site, consumers had to check the
box.  A157 ("[T]he customer had to check the box in order to proceed in order to
provide payment or gain access.").  Berkson encountered a "create account" page
with empty fields to enter information such as name, username and password,
directly beneath which was the sentence "By clicking 'Next' I agree to the <u>terms of
use</u> and <u>privacy policy</u>," directly beneath which was the "Next" button.  A182.

26

Multiple features of this design demonstrate assent to the Terms of Use. First, the key words on the screen communicate this. Consumers expressly acknowledged that they were "agree[ing]" when they clicked the "Sign In" button (or clicked the "Next" button or checked the box, *see supra* n.4). A125. And consumers expressly acknowledged that they were agreeing to "terms" regarding the use of the site—a word that obviously communicates binding conditions. By requiring "agree[ment]" to "terms," the site makes clear the contractual nature of the act of clicking "Sign In." The contract is in no way concealed or disguised. Second, the direct connection between the agreement and the act of clicking "Sign In" is apparent through the clear language that "By clicking 'Sign In' I agree to the terms of use" and by the location of that notice directly above and on the same screen as the required "Sign In" button. Finally, the full content of the "terms" to which consumers expressly "agree[d]" was easily accessible to them, by clicking on the hyperlink (indicated through the standard convention of underlining). On dozens of occasions, Plaintiffs were presented with this access to the contractual terms and notice of the contractual consequences of clicking "Sign In," and each time they clicked the button indicating their assent.

**2.     The overwhelming weight of authority demonstrates that such agreements are effective.**

Multiple court decisions demonstrate that agreements like the ones here are effective. Although this Court has not previously confronted a factually analogous

situation, its precedent supports the same conclusion.  In *Schnabel*, this Court acknowledged that "[a] person can assent to terms even if he or she does not actually read them," if the offer "make[s] clear to a reasonable consumer both that terms are being presented and that they can be adopted through the conduct that the offeror alleges constituted assent."  697 F.3d at 123 (internal quotation marks and alteration omitted).  In that case, the plaintiffs, who had originally enrolled for the service online, failed to cancel their subscription after subsequently receiving an arbitration provision by email.  The defendants argued that the plaintiffs thereby manifested assent to the arbitration provision.  Because the arbitration provision was thus "both temporally and spatially decoupled from the plaintiffs' enrollment in and use of" the defendant's service, this Court held that plaintiffs did not agree to the terms.  *Id.* at 127.  Nonetheless, the Court recognized that "[a] requirement that the plaintiffs expressly manifest assent to the arbitration provision together with such assent would likely have overcome the email's defects in providing notice."  *Id.* at 128.  Here, in contrast, the *Schnabel* standard is met, as Gogo required just such assent at the same time and place as the use of its service, and Plaintiffs affirmatively provided it by clicking "Sign In."

Likewise, in *Specht*, this Court recognized the "general rule" that a "'party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing'" unless "the writing does not appear to be a contract and the terms

are not called to the attention of the recipient." 306 F.3d at 30. Although the Court in that case found that consumers did not manifest assent by clicking "Download" on a website, it based this conclusion on the fact that the "sole reference" on the webpage to the terms at issue "was located in text that would have become visible to plaintiffs only if they had scrolled down to the next screen," and as a result the "webpage screen was printed in such a manner that it tended to conceal the fact that it was an express acceptance of" the terms. *Id.* at 23, 32 (internal quotation marks omitted). The Court held that internet contracting requires "*[r]easonably conspicuous notice* of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers." *Id.* at 35 (emphasis added). Here, in contrast, the *Specht* standard was met, as Gogo provided more than "reasonably conspicuous notice of the existence of contract terms" by (i) giving notice of the terms and (ii) providing the hyperlink to access them on the same screen as—and immediately above—the sign-in button. *See* A125. Gogo also obtained "unambiguous manifestation of assent" by the consumer by clearly explaining that "[b]y clicking 'Sign In'," the consumer "agree[s]" to those terms and by requiring the consumer to click "Sign In" in order to use the service. *Id.*

In line with this Court's guidance, multiple district courts in the Second Circuit have found that consumers assented to contract terms under circumstances

like those here.  For example, in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835

(S.D.N.Y. 2012), the court considered a website setup virtually identical to

Gogo's:  consumers had to click on a "Sign Up" button immediately below which

was the sentence "By clicking Sign Up, you are indicating that you have read and

agree to the <u>Terms of Service</u>," with the phrase "Terms of Service" underlined

indicating a hyperlink.  The court found that the plaintiff assented to the contract

terms:  "Fteja was informed of the consequences of his assenting click and he was

shown, immediately below, where to click to understand those consequences. That

was enough."  *Id.* at 840.  Other Second Circuit district courts have likewise so

concluded.  *See, e.g.*, *Whitt v. Prosper Funding LLC*, No. 1:15-CV-136-GHW,

2015 WL 4254062, at *4 (S.D.N.Y. July 14, 2015) (requirement "to click a box

adjacent to the bolded text 'Clicking the box below constitutes your acceptance of

... *the borrower registration agreement*,' where the term '*borrower registration

agreement*' was conspicuously rendered as a hyperlink to the Agreement itself. …

indicated that he had at least constructive knowledge of the terms of the Agreement

and that he assented to those terms." (citations omitted)); *Nicosia v. Amazon.com,

Inc.*, --- F. Supp. 3d ---, 2015 WL 500180, at *5 (E.D.N.Y. Feb. 4, 2015)

(purchaser assented by clicking "Place your order" button next to statement that

'"By placing your order, you agree to Amazon.com's privacy notice and conditions

of use,"' with "conditions of use" displayed in blue font and hyperlinked to the

terms), *appeal docketed*, No. 15-423 (2d Cir. Feb. 13, 2015); *Starke v. Gilt Groupe, Inc.*, No. 13-Civ-5497(LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) ("When Starke clicked 'Shop Now,' he was informed that by doing so, and giving his email address, 'you agree to the Terms of Membership for all Gilt Groupe sites.' Regardless of whether he actually read the contract's terms, Starke was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them."); *5381 Partners LLC v. Shareasale.com, Inc.*, No. 12-CV-4263 JFB AKT, 2013 WL 5328324, at *4 (E.D.N.Y. Sept. 23, 2013) (user had to access a page with a hyperlink to the agreement and the statement "Make sure to read and understand our privacy policy and terms of Agreement" and a page requiring user to click a button next to the statement "By clicking and making a request to Activate, you agree to the terms and conditions in the Merchant Agreement"); *Zaltz v. JDATE*, 952 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) (user must click a check box "confirming that he or she has read and agreed to the Terms of Service and which features a hyperlink to a webpage displaying the Terms of Service").

Multiple district courts in other circuits agree. *See, e.g.*, *Tompkins v. 23andMe, Inc.*, Nos. 5:13-CV-05682-LHK et al., 2014 WL 2903752 (N.D. Cal. June 25, 2014); *Crawford v. Beachbody, LLC*, No. 14-cv-1583-GPC(KSC), 2014 WL 6606563 (S.D. Cal. Nov. 5, 2014); *E.K.D. ex rel. Dawes v. Facebook, Inc.*,

31

885 F. Supp. 2d 894 (S.D. Ill. 2012) (enforcing forum-selection clause when users must attest that they have read terms of service before gaining access to site); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904 (N.D. Cal. 2011) (enforcing contract where user must acknowledge terms of service that did not appear on the screen); *Guadagno v. E*Trade Bank,* 592 F. Supp. 2d 1263, 1267 (C.D. Cal. 2008) (upholding arbitration clause accessible via hyperlink above a box and statement that '"By checking this box, you acknowledge that you have reviewed the ... **Agreement** ....'"'); *Snap-on Bus. Solutions Inc. v. O'Neil & Assocs.*, 708 F. Supp. 2d 669, 682–83 (N.D. Ohio 2010) (upholding contract where user had to input user name and password and click "Enter" above link to the full terms and statement "The use of and access to the information on this site is subject to the terms and conditions set out in our legal statement" (internal quotation marks omitted)).

Academic commentary—including commentary that the district court cited with approval—further supports the enforceability of Gogo's contract. For instance, Gogo's setup more than satisfies the four-part test proposed by the American Bar Association for the validity of so-called "browse-wrap" agreements where a user is deemed to agree to terms through the mere use of the website. The ABA test was devised for such *passive* browse-wrap agreements—which, unlike Gogo's contract, do not require any affirmative action, such as clicking a button, by the consumer. But even for *passive* browse-wrap agreements, the ABA

32

endorses the view that "a user validly and reliably assents … if the following four elements are satisfied:

(i)    The user is provided with adequate notice of the existence of the proposed terms.

(ii)    The user has a meaningful opportunity to review the terms.

(iii)    The user is provided with adequate notice that taking a specified action (which may be use of the Web site) manifests assent to the terms.

(iv)    The user takes the action specified in the latter notice.

Christina L. Kunz, et al., *Browse-Wrap Agreements: Validity of Implied Assent in Electronic Form Agreements*, 59 Bus. Law. 279, 291 (2003).  Adequate notice of the existence of the terms is provided by "a well placed phrase or sentence in a format calculated to be apparent to the typical user of that Web site" such as an underlined hyperlink.  *Id.* at 293.  "[C]lear language in a hyperlink that the terms constitute a proposed agreement is more likely to result in a binding contract," such as "'Use of this Web site is subject to our terms of use, click here to read,'" or "[e]ven more informative, "'By going beyond this page, you are deemed to have agreed to our terms of use.'"  *Id.* at 294.  Not only did Gogo require an affirmative act of assent rather than mere continued browsing on the website, it (1) provided notice of the terms through a hyperlinked phrase directly above the Sign In button, (2) provided access to the terms through a single click on the hyperlink; and (3)

explained that clicking "Sign In" constitutes agreement to the terms; and (4) Plaintiffs took the action specified.  Plaintiffs plainly assented to the terms of use.

Gogo's site also applies multiple "best practices" recommended by "[e]xperts in commercial practice" to ensure that users have "a realistic opportunity to read" website terms of use.  A200.  For example, the user cannot proceed to use the site without clicking on the button indicating assent to the terms, the "terms of use are available in … a nearby hyperlink," and the hyperlink has an "obvious location on the webpage," directly above the "Sign In" button and visible without scrolling down to another screen.  *See* Allison S. Brehm & Cathy D. Lee, *"Click Here to Accept the Terms of Service"*, 31 Comm. Law., Winter 2015, at 4, 6–7 (listing nine best practices).  The district court faulted Gogo's website for not employing one specific recommended best practice (that the website require the user to scroll through the terms before clicking "accept"), A200, but it ignored the multiple best practices used by Gogo here.

### 3. The district court erroneously concluded that Plaintiffs did not assent.

In reaching a conclusion contrary to the weight of authority, the district court erred in multiple respects.  Procedurally, the district court erred by improperly placing heavy reliance on secondary social science literature and "anecdotal

evidence"[5] about what the average internet user understands, without providing the parties notice and an opportunity to weigh in.  It used this information—which it described as "exploratory sociological research about average internet users, limited empirical studies conducted by legal scholars and economists, and somewhat arbitrary assumptions by the court itself," A170—to "infer[] [Plaintiffs'] average capacity and understanding as internet users when they ordered Gogo's services," *id*.  But as Judge Weinstein himself has elsewhere cautioned, before considering such information, "[t]he court should *at least*, in accordance with our adversary requirements for the proof of controverted adjudicative facts, inform the parties of its intention to consider extra-record information so that they may have an opportunity to present rebutting information."  1 *Weinstein's Federal Evidence* § 201.51[2] (2015).  In *Bulova Watch Co. v. K. Hattori & Co.*, the court took "extensive judicial notice …, based partly upon the court's own research," of various aspects of the history and functioning of multinational corporations.  508 F. Supp. 1322, 1328–29 (E.D.N.Y. 1981) (Weinstein, J.).  Before ruling, however, "the court issued a preliminary memorandum and invited the parties to be heard on the 'propriety of taking judicial notice and the tenor of the matter noticed.'"  *Id.*

---

[5] The "anecdotal evidence" consisted in its entirety of a 2010 article paraphrasing Chief Justice John Roberts' confession that he does not "usually read the computer jargon that is a condition of accessing websites" and a joke by HBO comedian John Oliver about people's willingness to click "agree."  A191.

Such a procedure "complies with the spirit of Rule 201(e) of the Federal Rules of Evidence" regarding a party's entitlement to an opportunity to be heard. *Id*. It also "has the advantage of reducing the possibility of egregious errors by the court and increases the probability that the parties may believe they were fairly treated." *Id*.; *see also Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.*, 993 F.2d 269, 273 (1st Cir. 1993) ("Ordinarily, when a district court takes judicial notice of a fact other than at the request of a party, it should notify the parties that it is doing so and afford them an opportunity to be heard."). The district court should have heeded its own advice here and invited the parties to present evidence to rebut the extra-record information that informed its ruling. Failing to do so was error.

Moreover, although the district court itself recognized that the available social science was "inadequate," it nonetheless interpreted the ambiguity in the social science, and particularly the absence of clear studies, *against* Gogo. A228 (placing the burden on vendors "until useful consumer studies demonstrate that average consumers using the computer understand what contract terms are being accepted when a purchase is made"). This was clear error. In this context, the court was required to make all factual inferences *in Gogo's favor*. *Schnabel*, 697 F. 3d at 113. The district court did the exact opposite.

In particular, the district court based its conclusions on its view of the "average" internet user—*i.e.*, "one who does not necessarily conduct much of her business online," A189—despite the undisputed fact that Plaintiffs in this action are frequent users of in-flight internet service, *see* A45. Far from the district court's apparent conception of the "average" internet user who spends little time online, Plaintiffs are such avid internet users that on numerous occasions it was important to them not to be deprived of internet service for the one- or two-hour duration of a plane ride. *Id.* And Plaintiffs never contended that they were internet novices. The only reasonable inference is that Plaintiffs are sophisticated, frequent internet users familiar with basic internet conventions and navigation. Yet the district court somehow inferred from its survey of the "inadequate" social-science literature that these specific plaintiffs had "*average* capacity and understanding as internet users when they ordered Gogo's services." A170 (emphasis added).

In any event, nothing the district court learned in its wide-ranging survey of social science and anecdote had anything to do with this case. Nonetheless, the district court improperly relied on this information, and more specifically on its *failure* to find anything relevant, even though it did not give Gogo any chance to provide relevant materials.

In particular, the district court was wrong to base its decision on its apparent finding of a flaw in the fact that the Terms of Use were hyperlinked from the sign-

37

in page.  As explained above, *supra* 30–35, the weight of authority supports the view that hyperlinks provide adequate notice of contractual terms, particularly where, as here, the hyperlink is immediately visible on the same screen and immediately adjacent to the button that indicates assent to the terms.  *See, e.g.*, *Whitt*, 2015 WL 4254062, at *5 (noting "abundance of persuasive authority" that conspicuous hyperlinks provide adequate notice); *Fteja*, 841 F. Supp. 2d at 839; *id.* at 840 ("'[a] person using a computer quickly learns that more information is available by clicking on a blue hyperlink'") (quoting *Hubbert v. Dell Corp.,* 835 N.E.2d 113, 121 (Ill. App. Ct. 2005)); *Zaltz*, 952 F. Supp. 2d at 454 (hyperlink showed plaintiff "precisely where to access the Terms and Conditions of Service before she agreed to them").

In the case of Gogo's website, not only was the hyperlink directly above the "Sign-In" button, it was prominent on the screen:  it was underlined and was part of a single sentence set off from other text on a screen with little else on it to distract from the link.  The user did not have to scroll down to find the link, *cf. Specht*, 306 F.3d at 23, 32, nor was the link otherwise obscured.  And as noted above, Plaintiffs' repeated use of in-flight internet service renders any inference that they are so unsophisticated that they would not understand the significance of a hyperlink utterly implausible.  The district court cited no case or secondary literature that suggests that reasonable users do not understand how to obtain

hyperlinked materials. As noted above, it was improper for the district court to place weight on social science (or the absence thereof) without notice to the parties—but in any event nothing that it found supported its conclusion, which is refuted by multiple cases, *supra* 30–33, that hyperlinked terms of use are not accessible to reasonably prudent users.

The district court also misread the record evidence regarding Plaintiffs' specific interactions with the Gogo website. With regard to Plaintiff Welsh, the district court "inferred" that Welsh did not click the box next to the statement "I agree to the Terms of Use" when he initially signed up for Gogo's service in August 2011. A177, A228. In support, the district court cited Welsh's declaration, A177, but that declaration studiously asserts only that Welsh did not see the specific provisions for arbitration and did not specifically agree to the arbitration and venue provisions[6]—not that Welsh did not check the box next to the statement of agreement to the Terms of Use as a whole. A115. The district court also noted

---

[6]  It is in this carefully crafted wording in plaintiffs' declarations that the Court may reasonably infer that they did indeed see the venue provision in the Terms of Use from their initial sign ups, and later saw both the arbitration and venue provisions in subsequent sign ins. Welsh says that he "never saw" the arbitration provisions in August 2011. A115 ¶¶ 4–7. Of course not. Those provisions did not appear until December of 2012. He tellingly fails to say that "never saw" the venue provisions (either in the first sign up or thereafter), or that he "never saw" the arbitration provisions once they became part of the Terms of Use in December of 2012. A115–116. Berkson's Declaration is identically crafted. Both Plaintiffs had the opportunity to swear they "never saw" these provisions as they appeared in the Terms of Use, but they did not do so. The only reasonable inference is that they indeed saw both provisions and thus had "actual notice" of them.

39

that the check box was not accompanied by an asterisk and quoted the deposition of Gogo's corporate representative who explained that if there is not an asterisk by a field on the webpage, "'it doesn't require the user to input text.'"  A177, A228. But the district court completely ignored the uncontroverted testimony by the same Gogo representative that "the customer had to check the box in order to proceed in order to provide payment or gain access."  A157.  This testimony is therefore wholly consistent with Welsh having to check the box to proceed, a step that requires the user to merely click on the box, not to input text.

In addition, the district court erroneously based its decision solely on Welsh's August 2011 initial sign-up.  It ignored the numerous instances through February 2013 that Welsh used the in-flight internet service, A39 ¶ 8, at which times he would have been required to click the "Sign In" button below the hyperlinked statement "By clicking 'Sign In' I agree to the terms of use and privacy policy," *see* A125.  It also ignored the 15 occasions that Welsh, after having cancelled his monthly Gogo service in February 2013, again purchased Gogo's service, at which times he would have had yet again to indicate his agreement to the Terms of Use.  A45–46 ¶¶ 9–10.  Independent of the August 2011 initial sign-up, Welsh thus manifested assent to the terms of use dozens of times. There is therefore no basis, under any standard of review, to accept the district court's inference that Welsh did not take the required affirmative steps to indicate

his agreement to the Terms of Use.  The district court's error is only further compounded by its failure to follow this Court's requirement that it draw all inferences in Gogo's favor.

The district court likewise misread the record with regard to Plaintiff Berkson.  The district court emphasized that the sign-in page had two "Sign In" buttons and that the one "in the upper right-hand corner sits alone" with "[n]o language either above it or near it [that] requires a consumer to agree to any 'Terms of Use.'" A181.  It concluded that "[i]t cannot be taken for granted that Berkson clicked on the 'SIGN IN' button on the lower left hand corner of the website." A230.  The district court ignored the uncontroverted testimony by Gogo's representative that the upper right-hand "Sign In" button was merely a navigation button that when clicked would take the user back to the sign-in page, and that the consumer could not use the service without clicking the lower left-hand "Sign In" button directly below the notice of agreement to the terms of use. A158.  With regard to Berkson's initial sign-up for the service, which required him to click on "Next" (and therefore had nothing to do with the upper right-hand "Sign In" button), the district court faulted the "small font" of the notice of agreement to the Terms of Use above the "NEXT" button.  A231.  But the font used for this notice is precisely the same size as the font next to every entry field on the create account form on that page; the word "NEXT" is in all caps and is the

41

same size for both the notice of agreement to the Terms of Use and the "NEXT" button; and the phrase "terms of use" is underlined indicating the hyperlink as well as making the phrase stand out on the screen.  A125.

Finally, as with Plaintiff Welsh, the district court ignored the numerous times Berkson used the service after initially signing up in September 2012, A45 ¶ 7.  On each of those occasions, Berkson had to click "Sign In" directly below the statement "By clicking 'Sign In' I agree to the terms of use and privacy policy."  *See* A125.  Again, the only reasonable inference (and certainly the only possible conclusion drawing all inferences in Gogo's favor as required) is that Berkson, like Welsh, repeatedly assented to the terms of use.

## II.    THE ARBITRATION CLAUSE SHOULD BE ENFORCED.

The district court's sole reason for declining to compel arbitration was that the Terms of Use were not enforceable due to lack of effective mutual assent.  For the reasons set forth above, that decision was incorrect.  By signing in, both Plaintiffs consented to the Terms of Use, which included a valid arbitration clause.

Although the district court did not reach the enforceability of the arbitration clause itself, this Court is free to reach it in the first instance as it can be determined as a matter of law.  *Cf. Simpson v. City of N.Y.*, --- F.3d ---, 2015 WL 4256471, at *6 (2d Cir. July 15, 2015) (deciding question of law unreached by district court).  (To the extent the Court chooses not to decide the enforceability of

42

the arbitration clause in the first instance, however, the case should be remanded

with instructions to transfer to the Northern District of Illinois.  *See* Part III, *infra*.)

The FAA "establishes a national policy favoring arbitration when the parties

contract for that mode of dispute resolution." *Preston v. Ferrer*, 552 U.S. 346, 349

(2008); *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1749 (2011) (it is

"beyond dispute that the FAA was designed to promote arbitration"; "[Our cases]

have repeatedly described the Act as embodying a national policy favoring

arbitration, and a liberal federal policy favoring arbitration agreements,

notwithstanding any state substantive or procedural policies to the contrary)

(internal quotation marks, alterations and citations omitted).  "The issue of an

arbitration agreement's scope is governed by 'the federal substantive law of

arbitrability'" and "'must be addressed with a healthy regard for the federal policy

favoring arbitration.'" *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional*

*De Venezuela,* 991 F.2d 42, 48 (2d Cir. 1993) (quoting *Mitsubishi Motors Corp. v.*

*Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 626 (1985)).  "'The Arbitration Act

establishes that, as a matter of federal law, any doubts concerning the scope of

arbitrable issues should be resolved in favor of arbitration ….'" *Id.* (quoting

*Mitsubishi Motors,* 473 U.S. at 626).  "In deciding the question of arbitrability, the

'federal policy [is] to construe liberally arbitration clauses, to find that they cover

disputes reasonably contemplated by this language, and to resolve doubts in favor

of arbitration.'" *Coenen v. R. W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972) (quoting *Metro Indus. Painting Corp. v. Terminal Constr. Co*., 287 F.2d 382, 385 (2d Cir. 1961)). "[U]nless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the dispute should be submitted to arbitration." *Concourse Vill., Inc. v. Local 32E, Serv. Emps. Int'l Union, AFL–CIO,* 822 F.2d 302, 304 (2d Cir. 1987) (internal quotation marks omitted).

Plaintiffs here agreed to arbitrate all disputes with Gogo. As of December 2012, the Terms of Use, to which both Plaintiffs assented, incorporated a broadly worded arbitration provision: "You agree that the sole and exclusive forum and remedy for any and all disputes and claims that cannot be resolved informally and that relate in any way to or arise out of the Site, the Service or these Terms and Conditions, shall be final and binding arbitration," A70. Both Plaintiffs agreed to those Terms of Use because both signed in after December 2012 and, as shown above, signing in required assenting to the Terms of Use. *Supra* 25–43.

The arbitration clause incorporated as of December 2012 requires arbitration of the claims Plaintiffs assert, even though they arise from credit card charges that predate December 2012, as the cases make clear. In light of "the strong federal policy in favor of arbitration, the existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with

44

positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999) (internal quotation marks omitted).

Here, the plain language of the arbitration clause covers "*any and all* disputes and claims … *that relate in any way to* or arise out of the Site, the Service or these Terms and Conditions." A70 (emphasis added). Plaintiffs' claims that Gogo improperly charged them through automatic monthly payments are indisputably claims "that relate in any way to or arise out of the Site, the Service of these Terms and Conditions." Moreover, Plaintiffs agreed to arbitrate *any and all* such claims, without temporal or other limitation. Under a straightforward reading of the clause, these claims are subject to arbitration. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (presumption in favor of arbitrability "is particularly applicable where the clause is as broad as the one employed in this case, which provides for arbitration of 'any differences arising with respect to the interpretation of this contract or the performance of any obligation hereunder ....' In such cases, '[i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" (quoting

45

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–585 (1960)).

Courts routinely hold that broadly worded arbitration clauses like this one require arbitration of *all* claims—including those based on facts that occurred *before* the agreement to arbitrate was entered. For example, in *Smith/Enron*, 198 F.3d at 99, this Court held that claims "concern[ing] events that predate the 1994 Agreement" were covered by the Agreement's arbitration clause. Because the arbitration clause "does not contain any temporal limitation, the relevant inquiry is whether SCI's claims 'relat[e] to any obligation or claimed obligation under' the 1994 Agreement, not when they arose." *Id.* This Court held that it was "evident" that the claims "fall within this broad language." *Id.*; *see also Coenen*, 453 F.2d at 1212 (enforcing arbitration provision with regard to claims that predated the signing of the contract because it required arbitration of "any controversy" between the parties). Requiring arbitration of such claims thus gives effect to the parties' intentions under the contract in addition to respecting the strong federal policy in favor of arbitration. It is therefore unsurprising that numerous courts have so held. *See, e.g.*, *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267 (4th Cir. 2011); *Kristian v. Comcast Corp.*, 446 F.3d 25, 33 (1st Cir. 2006); *Mehler v. Terminix Int'l Co.*, 205 F.3d 44, 50 (2d Cir. 2000); *Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 332 (10th Cir. 1993); *In re Verisign, Inc. Derivative*

46

*Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 407 (S.D.N.Y. 2003); *Sacchi v. Verizon Online LLC*, No. 14-CV-423-RA, 2015 WL 765940, at *9 (S.D.N.Y. Feb. 23, 2015), *reconsideration denied*, No. 14-CV-423 RA, 2015 WL 1729796 (S.D.N.Y. Apr. 14, 2015); *see also TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 35 (2d Cir. 2011) (applying forum-selection clause to claims that pre-dated the agreement).

Plaintiffs have identified no other valid basis for declining to enforce the arbitration agreement. Before the district court, the only additional argument Plaintiffs made was that the arbitration clause is unconscionable. Dkt. 29 at 13. This argument is baseless. For the arbitration agreement to be unenforceable as unconscionable, Plaintiffs would have to show *both* procedural and substantive unconscionability, *i.e.*, the "'absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" 8 *Williston on Contracts* § 18:9 (4th ed. 2015). Plaintiffs contended that the transaction "unreasonably favored Gogo" because Plaintiffs "had no option but to use Gogo's service if they wanted to access the Internet while in flight" and they therefore "had no choice but to accept the terms of the arbitration clauses." Dkt. 29 at 13. This is simply false. The Terms of Use expressly and conspicuously permit permitted consumers to opt-out of arbitration. A74 (noting existence of

Opt-Out procedures in all capitals on page 1 of the Terms of Use); A81 (explaining opt-out procedures in all capitals). In any event, Plaintiffs' argument is simply another way of saying that the contract was a contract of adhesion, and it is well established that "the fact that a contract is one of adhesion does not itself render the contract unconscionable." *Williston*, *supra* § 18:10.

Plaintiffs further contended that the Terms of Use were "generally in fine print and continue on for ten pages." Dkt. 29 at 14. This is also simply false. Notice of the Arbitration Clause and the existence of an opt-out are featured prominently in all capitals and underlined on the very first page of the Terms of Use. A64, A74. In addition, the full text of the arbitration clause is preceded, on page 7 of the Terms of Use, by a heading in large font and separated from the body of the text stating "10. Dispute Resolution/Arbitration." A70, A80. Plaintiffs next argued that they lacked "experience and education" because they are not lawyers. But if a party's lack of a law degree rendered a contract unconscionable, only 0.4% of the U.S. population could enter into valid contracts.[7] Finally, Plaintiffs contended that there was a disparity in bargaining power, but again, Plaintiffs had the option to opt-out of the clause. There is no procedural unconscionability here.

---

[7] *See* ABA, *National Lawyer Population Survey* (2015), *available at:* http://www.americanbar.org/content/dam/aba/administrative/market_research/total -national-lawyer-population-1878-2015.authcheckdam.pdf.

Because Plaintiffs must establish *both* procedural and substantive unconscionability, this Court need go no further. In any event, Plaintiffs cannot establish substantive unconscionability either. Plaintiffs' only argument is that the arbitration clause carves out certain claims in a way that favors Gogo. This argument is a non-starter because Plaintiffs retained the option to opt out of arbitration "with regard to *any* particular interaction with the site, the domain, or the service." A81 (emphasis added). In addition, the clause specifically exempts Plaintiffs' potential claims that qualify for hearing in small claims court. *Id*. Given these exemptions for plaintiffs' claims, that the clause also exempts certain of defendants' potential claims for which the availability of immediate relief is crucial, such as violations of copyright, trade secret, and privacy rights, does not render it unreasonably favorable to Gogo. *See Carson v. Higbee Co.*, 149 F. App'x 289, 294–95 (5th Cir. 2005) (per curiam) (arbitration agreement between employer and employee was not substantively unconscionable where "both the Company and the employee retain the right to a judicial forum in certain instances"). Moreover, the arbitration clause contains other features that are *more* favorable to Plaintiffs than to Gogo. *See* A81 (providing that for claims totaling under $75,000, Gogo generally pays all filing, administration and arbitrator fees; allowing attorney fees for Plaintiffs but generally not for Gogo). The arbitration clause is thus not substantively unconscionable.

49

Plaintiffs affirmatively assented to the Terms of Use including the arbitration clause, the plain language of that clause applies to Plaintiffs' claims, and there is no other basis for refusing to enforce the agreement. This Court should therefore reverse the district court's denial of the motion to compel arbitration.

## III. THE FORUM-SELECTION CLAUSE SHOULD BE ENFORCED.

If this Court does not instruct the district court to compel arbitration, it should nonetheless order the case transferred to the District Court for the Northern District of Illinois. As explained above, Plaintiffs assented to Gogo's Terms of Use. *See supra* at 25–43. The Terms of Use, both the versions in effect when Welsh and Berkson first contracted with Gogo and later ones, contained a valid forum-selection clause. *See* A54, A62, A72, A82. Under current law, such clauses must "'be given controlling weight in all but the most exceptional cases.'" *Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex.*, 134 S. Ct. 568, 581 (2013) (alteration omitted). Because Plaintiffs have failed to offer any evidence that this case fits within the narrow exception contemplated in *Atlantic Marine*, this Court should exercise pendent appellate jurisdiction and remand the case to the

district court so it can enforce the parties' agreement as to the proper forum under

28 U.S.C. § 1404(a).[8]

### A. This Court Has The Power To Review The Validity Of The Forum-Selection Clause.

This Court may review the denial of Gogo's § 1404(a) request for transfer of

venue, in addition to reviewing the denial of Gogo's motion to compel arbitration.

It is well-established that when "an interlocutory appeal of a district court's ruling

is properly before [an appellate court], [that court has] the discretion to entertain an

appeal of another ruling of the district court if 'the two rulings [a]re "inextricably

intertwined."'" *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008)

(quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)).

In this case, the district court's denials of Gogo's motion to compel

arbitration and motion to transfer venue are "inextricably intertwined" because

"the same specific question," *i.e.*, whether Plaintiffs assented to the Terms of Use,

"underl[ies] both the appealable order and the non-appealable order." *Stolt-Nielsen*

*SA v. Celanese AG*, 430 F.3d 567, 576 (2d Cir. 2005) (quotations omitted). The

answer to that common question, moreover, turns on the same operative facts and

contract language—a fact that the district court effectively recognized when it

---

[8] The district court also ruled that plaintiffs have standing to pursue their claims. A247. Defendants reserve their rights to challenge this ruling in due course.

51

erroneously dispensed with both motions on the same grounds.[9]  A228–32; *see also Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) (noting that arbitration and forum-selection clauses, in many ways, are species of each other). Because these rulings present the same question and turn on the same facts, this Court may exercise pendent appellate jurisdiction consistent with its prior decisions.  *See, e.g.*, *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1050 (2d Cir. 1997) (exercising pendent appellate jurisdiction when both claims turned on language of contract); *see also Griswold v. Coventry First LLC*, 762 F.3d 264, 269 (3d Cir. 2014) (recognizing that pendent appellate jurisdiction is appropriate "where there is a sufficient overlap in the facts relevant to both the appealable and nonappealable issues to warrant *plenary* review") (internal quotation marks omitted).

Furthermore, this Court should exercise pendent appellate jurisdiction over the transfer ruling to avoid "a manifest waste of … time and resources."  *Ross*, 547 F.3d at 142.  As demonstrated below, the district court abused its discretion by refusing to enforce the forum-selection clause.  *See Filmline (Cross-Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 520 (2d Cir. 1989) (court of

---

[9] For purposes of pendent appellate jurisdiction, it does not matter that the ultimate resolution of the two motions turns on uncommon questions, so long as both of the district court's rulings present the same specific question.  *See, e.g.*, *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (exercising pendent appellate jurisdiction over a cross-appeal even though it presented "the broader issue of defendants' liability").

appeals will reverse a district court's transfer ruling upon a "clear showing of abuse"); *United States v. Figueroa*, 548 F.3d 222, 226 (2d Cir. 2008) (a court abuses its discretion when its ruling "'rests on an error of law'"); *see also Atl. Marine*, 134 S. Ct. at 584 (reversing court of appeals' failure to enforce a forum-selection clause in mandamus action).  Any further proceedings in the Eastern District of New York at this juncture would be for naught if this Court were ultimately to reverse the forum-selection ruling in a subsequent appeal.  This Court may prevent such unnecessary expenditures by reviewing the district court's ruling now.  For these reasons, it can and should exercise pendent appellate jurisdiction over Gogo's appeal of the denial of venue transfer.

> **B.** **The Forum-Selection Clause Is Enforceable.**

When Plaintiffs initially signed up for Gogo's service, and every time they signed in thereafter, the Terms of Use to which they agreed included a forum-selection clause.  *See supra* at 13.  In relevant part, that clause states:  the parties agree that "any claim or dispute one party has against the other party arising under or relating to this Agreement (including claims in contract, tort, strict liability, statutory liability, or other claims) must be resolved exclusively by a court of

competent jurisdiction, federal or state, located in Chicago, Illinois, and no other court." A54, A62.[10]

Under Second Circuit precedent, this clause must be presumed enforceable so long as it (1) "was reasonably communicated to the party resisting enforcement"; (2) contains "mandatory force" language; and (3) "the claims and parties involved in the suit are subject to the forum selection clause."[11] *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (internal quotation marks omitted). To overcome the presumption that a forum-selection clause is

---

[10] After the arbitration clause was added to the Terms of Use in December 2012, the forum selection clause read:

> The parties agree that any claim or dispute one party has against the other party arising under or relating to this Agreement (including claims in contract, tort, strict liability, statutory liability, or other claims) that is not resolved under Section 10 of this Agreement (Dispute Resolution / Arbitration) must be resolved exclusively by a court of competent jurisdiction, federal or state, located in Chicago, Illinois, and no other court.

A72.

[11] Whether a forum-selection clause contains "mandatory force" language or covers the claims and parties involved depends upon the law of the forum selected, including its choice-of-law rules. *See Martinez v. Bloomberg LP*, 740 F.3d 211, 217–18 (2d Cir. 2014). In this case, the applicable law is most likely that of Illinois. *See Martin v. Heinold Commodities, Inc.*, 510 N.E.2d 840, 847 (Ill. 1987) (applying Illinois law where contract contained Illinois choice-of-law provision). Regardless, New York, Illinois, and California interpret contracts similarly based on their plain language. *See, e.g.*, *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014); *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999); *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 627 (Cal. 1995). Thus, as applied to this analysis, the choice of law is of no import.

enforceable, Plaintiffs must '"mak[e] a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."' *Id.* (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)). The forum-selection clause here is presumptively enforceable, Plaintiffs cannot satisfy their burden to overcome the presumption.

### 1. The forum-selection clause is presumptively enforceable.

First, the forum-selection provision was "reasonably communicated" to Plaintiffs. Gogo included the provision in the Terms of Use, which were easily accessible and to which Plaintiffs assented. *See supra* at 25–43. The provision itself was accompanied by a bold-faced heading labeled "Governing Law and Venue." A54, A62, A72, A82. Plaintiffs have conceded that the "'[r]easonable communication' [prong] is an alternate characterization of the mutual assent inquiry." Dkt. 29 at 24. Thus, because Plaintiffs assented to the Terms of Use, the forum-selection clause has also been reasonably communicated to them.

Second, by stating that "*any claim or dispute . . . must* be resolved *exclusively* by a court . . . located in Chicago, Illinois, and *no other* court," the forum-selection clause makes clear that it is mandatory in nature. A54, A62 (emphases added); *see also* A72, A82. The use of "must" indicates an intent that any litigation take place in Chicago. *See, e.g.*, *Cnty. of Du Page v. RWS Dev., Inc.*,

643 N.E.2d 242, 244 (Ill. App. Ct. 1994) ("The use of the words 'shall' or 'must' is usually considered mandatory."); *Koenke v. Koenke*, 91 A.D.2d 1142, 1143 (N.Y. App. Div. 1983) ("'[M]ust' is mandatory."); *Pleasant Grove Union Sch. Dist. v. Algeo*, 215 P. 726, 726 (Cal. Dist. Ct. App. 1923) ("In ordinary parlance the words "shall" and "must" are compulsory in meaning …."). That intent is made clear with the addition of the word "exclusively" and the words "and no other court." *Cf. Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 587–88 (1991) (approving similar language). Thus, under California, Illinois, or New York law, the forum-selection clause must be construed to contain mandatory-force language.

Third, the plain language of the forum-selection clause covers this dispute between these parties. The clause covers "*any* claim or dispute *one party has against the other party* arising under or *relating to this Agreement* (including claims in contract, *tort*, strict liability, *statutory liability*, or other claims)." A54, A62 (emphases added); *see also* A72, A82. "Any" is an indeterminate adjective that covers "all" of the noun it modifies. *Oxford English Dictionary* (2015) (online), http://www.oed.com/view/Entry/8973?redirectedFrom=any#eid. Thus, the clause encompasses all claims brought between Gogo and its users, including those like Plaintiffs', which are alleged under tort and statutory law and explicitly covered by terms of the clause. Moreover, the clause concerns any claims that "relat[e] to" the Terms of Use. In construing the same phrase in an analogous

56

sentence, the Supreme Court has recognized that "relate to" ordinarily means

anything that "has a connection with or reference to such a[n] [agreement]." *Shaw*

*v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97 (1983) (interpreting 29 U.S.C.

§ 1144(a)). Certainly, this suit—whether brought as a fraud action or a false-

advertising claim—has a connection to the agreement because that agreement

governed the conduct of Gogo and Plaintiffs. To date, Plaintiffs have not offered

any valid reason why this language should not be given its ordinary meaning, as

required under California, Illinois, and New York law. *See* Dkt. 29 at 22.

Consequently, the clause must meet the third prong of the *Martinez* test, and as a

result, the forum-selection clause must be presumed enforceable in this case.

### 2. Plaintiffs cannot satisfy their burden to overcome the presumption.

Plaintiffs cannot "'mak[e] a sufficiently strong showing that enforcement

would be unreasonable or unjust, or that the clause was invalid for such reasons as

fraud or overreaching'" to overcome this presumption. *Martinez*, 740 F.3d at 217

(quoting *The Bremen*, 407 U.S. at 15). There has been no allegation that Gogo

secured the *forum-selection* clause by fraud or overreaching. *Cf. D.H. Blair & Co.*

*v. Gottdiener*, 462 F.3d 95, 103 (2d Cir. 2006). Nor can this clause be considered

unreasonable or unjust, as demonstrated by the forum-selection clauses approved

by the Supreme Court, which required American companies and citizens to litigate

far from their fora of choice. *See The Bremen*, 407 U.S. at 17–18 (enforcing clause

57

selecting London as the forum for a dispute between an American and a German company); *Carnival Cruise*, 499 U.S. at 587, 596–97 (enforcing clause requiring a resident of Washington state to litigate in Florida). Plaintiffs have offered no valid arguments that distinguish the clauses in these cases. As a result, "[t]here can be nothing 'unreasonable and unjust'" in requiring Plaintiffs to litigate their proposed nationwide class action in Chicago rather than New York. *AVC Nederland B.V. v. Atrium Inv. P'ship*, 740 F.2d 148, 156 (2d Cir. 1984). "[W]hat would be unreasonable and unjust," as Judge Friendly recognized, "would be to allow [Plaintiffs] to disregard [their agreement]." *Id.* Thus, this Court must conclude that the forum-selection clause is valid.

### C. The Forum-Selection Clause Requires Transfer Of The Case To The Northern District Of Illinois.

Because the parties have agreed to a valid forum-selection clause, this case should be transferred under 28 U.S.C. § 1404(a) to the Northern District of Illinois. Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to ... any district or division to which all parties have consented." Ordinarily when ruling on a motion to transfer venue, the district court would balance the private interests of the parties and potential witnesses with the interest of the public. *See Atl. Marine*, 134 S. Ct. at 581 & n.6. Given the existence of a valid forum-selection clause, however, the courts must "deem the private-interest factors to weigh entirely in

58

favor of the preselected forum."[12]  *Id.* at 582.  Consequently, "the plaintiff[s] bear[] the burden of establishing that transfer to the forum for which the parties bargained is unwarranted" based solely on the public-interest factors.[13]  *Id.* at 581.

In this case, Plaintiffs have not made—and cannot make—such an extraordinary showing.  One, there is no evidence that the District Court for the Northern District of Illinois is overly congested and unable to handle this case compared to the District Court for the Eastern District of New York.  After all, according to the latest statistics, the Northern District of Illinois saw the number of civil filings in its jurisdiction decrease by 11.4 percent between 2013 and 2014, while, in the same time period, the number of filings in the Eastern District of New York *increased* by 17.6 percent.  *See* U.S. Courts, *Federal Judicial Caseload Statistics 2014 Tables* tbl.C, *available at* http://www.uscourts.gov/statistics-reports/federal-judicial-caseload-statistics-2014-tables (updated Mar. 31, 2014). And two, it is difficult to see how the District Court for the Eastern District of New York has a greater interest in a proposed nationwide class action than any of its

---

[12] In contrast to plaintiffs' arguments below, Dkt. 29 at 25, the Supreme Court has stated that "the plaintiff's choice of forum merits no weight."  *Atl. Marine*, 134 S. Ct. at 581.

[13] "Public-interest factors may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'"  *Atl. Marine*, 134 S. Ct. at 581 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

sister courts.  As a result, Plaintiffs cannot make the necessary showing, and under *Atlantic Marine*, this Court should order the district court to transfer this case to the Northern District of Illinois.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should vacate the district court's opinion holding that Plaintiffs did not assent to the Terms of Use.  The Court should remand with instructions to compel arbitration.  In the alternative, the Court should remand with instructions to transfer the case to the Northern District of Illinois.

Respectfully submitted,

Dated:  July 31, 2015

/s/ David H. Hoffman

Anthony J. Laura
EPSTEIN BECKER & GREEN, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500

David H. Hoffman
Tacy Fletcher Flint
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Il. 60603
(312) 853-7000

Jennifer J. Clark
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

*Attorneys for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 32(a) and Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that the accompanying brief has been prepared using 14-point Times New Roman typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the font used in this brief is proportionally spaced and contains 13,984 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: July 31, 2015

/s/ David H. Hoffman
David H. Hoffman

*Attorney for Defendants-Appellants*